United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 15, 2002 Decided May 14, 2002 

 No. 01-1131

 KPMG, LLP, 
 Petitioner

 v.

 Securities and Exchange Commission, 
 Respondent

 On Petition for Review of an Order of the 
 Securities and Exchange Commission

 Michael P. Carroll argued the cause for petitioner. With 
him on the brief were Ronald S. Flagg and Joseph R. Guerra.

 Louis A. Craco, Jr. argued the cause and filed the brief for 
amicus curiae American Institute of Certified Public Accoun-
tants in support of petitioner.

 Rada Lynn Potts, Senior Litigation Counsel, Securities and 
Exchange Commission, argued the cause for respondent. 

With her on the brief were David M. Becker, General Coun-
sel, Jacob H. Stillman, Solicitor, and Michael A. Conley, 
Attorney.

 Before: Henderson, Randolph and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Dissenting opinion filed by Circuit Judge Randolph.

 Rogers, Circuit Judge: KPMG, LLP (formerly KPMG 
Peat Markwick, LLP) challenges a cease-and-desist order 
entered by the Securities and Exchange Commission, pursu-
ant to Section 21C(a) of the Securities and Exchange Act 
("Exchange Act"), 15 U.S.C. s 78u-3(a), on the basis of 
several violations of the securities laws and regulations. 
KPMG principally contends that the Commission lacks au-
thority to turn the ancillary authority provided by Section 
21C into an independent basis to sanction accountants, failed 
to give fair notice of its novel interpretation of Rule 302 of the 
Code of Professional Conduct of the Association of Indepen-
dent Certified Public Accountants ("AICPA"), and adopted an 
improper presumption in concluding there was a sufficient 
risk of future violations warranting a cease-and-desist reme-
dy. KPMG also contends that the cease-and-desist order is 
overbroad and vague. We hold that although KPMG did not 
have fair notice of the Commission's interpretation of AICPA 
Rule 302, the Commission properly could use a negligence 
standard to enforce violations of the Exchange Act and 
Commission rules under Section 21C. We also hold that 
several contentions are waived, not having been raised before 
the Commission. We further hold that, although the Com-
mission's explanation on reconsideration of the basis for its 
conclusion that there was a risk of future harm might leave 
ambiguous whether simply one or more than one of the 
violations would be sufficient to meet its standard for entry of 
a cease-and-desist order, there is no ambiguity here that the 
Commission on remand would reach the same result. Ac-
cordingly, we deny the petition for review.

 I.

 The Commission issued the cease-and-desist order follow-
ing an evidentiary hearing that commenced, based on allega-
tions by the Division of Enforcement and the Office of the 
Chief Accountant (together, "the Division"), with the issuance 
on December 4, 1997, of an order instituting a proceeding 
("OIP") under Commission Rule of Practice 102(e) and Sec-
tion 21C of the Exchange Act. The evidentiary hearing was 
to determine if KPMG had engaged in improper professional 
conduct in violation of Rule 2-02 of Regulation S-X and 
caused violations of Section 13(a) of the Act and Rule 13a-1 
thereunder, and if so, what remedial actions or sanctions 
would be appropriate. The evidence at the hearing revealed 
the following:

 In January 1995, as part of an effort to start a separate 
entity that would provide financial and business consulting 
services to clients, KPMG (then known as KPMG Peat Mar-
wick) entered into a license agreement with KPMG BayMark, 
LLC ("BayMark"), and BayMark subsidiaries known as 
KPMG BayMark Strategies ("Strategies"), and KPMG Bay-
Mark Capital. Under its license agreement, KPMG agreed 
to lend $100,000 to each of the four founding principals to be 
used by them as equity contributions to BayMark and its 
subsidiaries. Also under the agreement, KPMG granted 
BayMark rights to use "KPMG" as part of its name in return 
for a royalty fee of five percent of its quarterly consolidated 
fee income.

 Glenn Perry, a senior partner in KPMG's Department of 
Professional Practice ("DPP") had previously met with Com-
mission staff from the Office of the Chief Accountant ("OCA") 
to discuss independence issues surrounding the BayMark 
arrangement, and when OCA became aware that KPMG was 
moving forward with the plan, OCA staff asked KPMG for 
additional information. On October 19, 1995, Perry and a 
KPMG senior manager named Chris Trattou met with OCA 
staff. The meeting concluded with OCA staff cautioning 
KPMG against having BayMark provide services to any of 
the audit clients of KPMG. Notwithstanding this warning, on 

November 3, 1995, Strategies entered into an agreement with 
PORTA--a long-standing KPMG audit client facing financial 
difficulties--to provide "turnaround services" and assist it 
with financing. Leonard Sturm, KPMG's engagement part-
ner for PORTA's 1994 audit, had introduced PORTA to 
BayMark. Under the agreement between PORTA and Strat-
egies, one of BayMark's founding principals, Edward Olson, 
would be Chief Operating Officer of PORTA and Strategies 
would receive a management fee of $250,000 and a "success 
fee" based on a percentage of PORTA's earnings, disposed 
inventory, and restructured debt. On November 9, 1995, 
PORTA's Board of Directors elected Olson president and 
Chief Operating Officer of the company.

 Sturm became aware that PORTA was engaging BayMark 
and contacted the DPP to determine whether it was okay for 
BayMark to provide services to an audit client. Trattou 
indicated that it was okay and that the Commission had no 
objection to it. Once Sturm learned that Olson was an officer 
of PORTA, he inquired again as to whether there were any 
independence concerns with the audit. Trattou discussed the 
matter with Michael Conway, the partner in charge of the 
DPP; they disagreed as to the propriety of the arrangement, 
with Conway (and Perry) expressing concern.

 After several meetings in December 1995 between Conway 
and Perry and OCA staff, OCA staff indicated that in order 
to resolve its independence concerns, KPMG would need to 
drop the KPMG initials from the BayMark parties' names, 
eliminate the royalty fee arrangement, and bring about the 
repayment of the $400,000 in loans made to the BayMark 
principals. Conway agreed to undertake negotiations with 
BayMark to make these changes. Although Conway alerted 
OCA staff to the existence of six dual engagements where 
KPMG was the auditor of record and BayMark had contracts 
with those clients, Conway did not inform OCA staff of the 
detailed entanglements involved with PORTA, i.e., the out-
standing loan to Olson, Olson's status as an officer of PORTA 
and a principal of BayMark, and the success fee arrange-
ment.

 The evidence also showed that sometime before December 
27, 1995, Trattou called Sturm with an answer to Sturm's 
earlier independence inquiries. Trattou indicated that the 
Commission was aware of the PORTA situation and that the 
KPMG audit of PORTA could proceed. On December 27, 
1995, PORTA signed KPMG's engagement letter to conduct 
its 1995 audit. When OCA staff discovered the PORTA 
audit, it informed Conway that KPMG was not independent 
from PORTA because none of the structural changes to the 
BayMark strategic alliance had been implemented and a loan 
was outstanding to Olson who was part of PORTA's manage-
ment. By letter of June 21, 1996, OCA advised PORTA that 
KPMG's independence had been compromised and that POR-
TA's audited financial statements included in its 1995 annual 
report would be considered unaudited and not in compliance 
with federal securities laws.

 In light of this evidence, an administrative law judge 
("ALJ") found that under Generally Accepted Auditing Stan-
dards ("GAAS"), KPMG lacked independence from PORTA 
by virtue of its loan to Olson and that as a result, KPMG 
engaged in and caused violations charged in the OIP but did 
not engage in improper professional conduct under Rule 
102(e) because KPMG did not act recklessly. See Matter of 
KPMG Peat Marwick L.L.P., 71 S.E.C. Dkt. 1220, 2000 WL 
45725, at *32-33 (Jan. 21, 2000). In determining a remedy, 
the ALJ considered the factors identified by the Commission 
as relevant to determining whether to issue an injunction: 
egregiousness of the defendant's action, isolated or recurrent 
nature of the infraction, degree of scienter involved, sincerity 
of the defendant's assurances against future violations, the 
defendant's recognition of the wrongful nature of his conduct, 
and the likelihood that his occupation will present opportuni-
ties for future violations. See id. at *34 (citing Joseph J. 
Barbato, 69 S.E.C. Dkt. 179, 200 n.31 (Feb. 10, 1999) (quoting 
Steadman v. SEC, 603 F.2d 1126, 1140 (5th Cir. 1979), aff'd 
on other grounds, 450 U.S. 91 (1981))). The ALJ declined to 
issue a cease-and-desist order. The ALJ considered it signifi-
cant that the audit itself was not challenged (and a second 
audit reached the same result), that the violations were not 

recurring, growing out of "highly unusual circumstances," and 
that there was no evidence of an adverse impact on investors. 
See id. at *34. The Division appealed the decision to the 
Commission.

 The Commission conducted "an independent review of the 
record." Order at 3. It concluded, on the basis of KPMG's 
debtor/creditor relationship with Olson and its right to share 
in Strategies' "success" fee, that KPMG's independence was 
impaired under GAAS. Noting that KPMG admitted that the 
loan to Olson impaired its independence under GAAS, the 
Commission characterized the violation as a "serious" mistake 
that arose from KPMG's failure to exercise ordinary care to 
maintain its independence. Further, the Commission inter-
preted AICPA Rule 302 to "flatly prohibit[ ] an auditor from 
'perform[ing] for a contingent fee for any professional ser-
vices, or receiv[ing] such a fee' from a client," and found that 
KPMG violated Rule 302 by receiving such a fee. The 
Commission concluded that "these relationships, whether con-
sidered individually or collectively, impaired [KPMG's] inde-
pendence." Order at 32. Because of these impairments, the 
Commission concluded that KPMG violated Rule 2-02 of 
Regulation S-X, 17 C.F.R. s 210.2-02(b)(1), which requires 
that the accountant's report "state whether the audit was 
made in accordance with generally accepted auditing stan-
dards." In addition, the Commission concluded that PORTA 
violated Section 13(a) of the Exchange Act, 15 U.S.C. 
s 78m(a), and Rule 13a-1, 17 C.F.R. s 240.13a-1, which 
requires issuers to file reports certified by independent public 
accountants. The Commission repeated that each of the two 
impairments (the debtor/creditor relationship and the contin-
gency fee arrangement) "considered on its own, compromised 
[KPMG's] independence and each is sufficient, on its own, to 
support our finding of violations of Section 13(a) and Rule 
13a-1," Order at 36, and "[s]imilarly, each impairment is 
sufficient, standing alone, to compromise independence under 
GAAS and to support our finding of violation of Rule 
2-02(b)(1)." Order at 36.

 Turning to the question of the appropriate sanctions for the 
violations, the Commission concluded that under Section 21C 

it could issue a cease-and-desist order for negligent conduct 
that causes a primary violation of the securities laws and 
regulations, and that KPMG had acted negligently in deter-
mining that it was independent from PORTA. As a result, 
the Commission issued a cease-and-desist order to KPMG 
because it acted negligently, which resulted in its primary 
violation of Rule 2-02(b) of Regulation S-X, and in its being a 
cause of PORTA's violations of Section 13(a) of the Exchange 
Act, 15 U.S.C. s 78m(a), and Rule 13a-1, 17 C.F.R. 
s 240.13a-1. The Commission denied KPMG's motion for 
reconsideration and KPMG appealed to the court.

 In Part II, we address KPMG's challenges to the determi-
nations underlying the Commission's decision to issue a 
cease-and-desist order. In Part III, we address KPMG's 
challenges to the cease-and-desist order.

 II.

 KPMG contends that it lacked fair notice in two respects. 
First, it contends it lacked fair notice of the Commission's 
interpretation of AICPA Rule 302 prohibiting the receipt of 
contingent fees. Second, it contends that it lacked fair notice 
that it could be sanctioned based on the conduct of Leonard 
Sturm. KPMG also contends that negligence is an impermis-
sible basis for a cease-and-desist order against accountants 
who cause a violation of securities laws or regulations. 
KPMG further contends that it was improper to impose a 
cease-and-desist order on it for causing a violation of Section 
13(a) of the Exchange Act in the absence of such an order 
against the primary violator, PORTA, and that it cannot be 
sanctioned as a primary violator of the securities laws under 
Rule 2-02(b) of Regulation S-X because that provision impos-
es enforceable duties only on registrants, not accountants.

 A.

 AICPA Rule 302 provides, in relevant part:

 Rule 302--Contingent fees. A member in public prac-
 tice shall not
 
 (1) Perform for a contingent fee any professional ser-
 vices for, or receive such a fee from a client for whom the 
 member or the member's firm performs,
 
 (a) an audit or review of a financial statement;
 
 ....
 
 The prohibition in (1) above applies during the period in 
 which the member or the member's firm is engaged to 
 perform any of the services listed above and the period 
 covered by any historical financial statements involved in 
 any such listed services.
 
 Except as stated in the next sentence, a contingent fee is 
 a fee established for the performance of any service 
 pursuant to an arrangement in which no fee will be 
 charged unless a specified finding or result is attained, or 
 in which the amount of the fee is otherwise dependent 
 upon the finding or result of such service.
 
American Institute of Certified Public Accountants ("AIC-
PA") Code of Professional Conduct Rule 302. The Commis-
sion found that KPMG's "success" fee arrangement with 
BayMark put it in a position to receive contingent fees in 
violation of the rule. See Order at 30. This determination 
that the conglomeration of fee arrangements at issue some-
how constituted, in their totality, a contingent fee arrange-
ment in favor of KPMG runs afoul of any interpretation the 
AICPA or the Commission has ever attached to Rule 302.

 Amicus AICPA points out that the Commission has recog-
nized that AICPA's interpretation of its rules is generally 
authoritative, see Opinion at 26 & n.67, and yet disregarded 
AICPA's interpretation and applied Rule 302 incorrectly. 
AICPA states that as defined, the term "contingency fee" 
does not reach either the "success" fee PORTA paid Bay-
Mark or the royalty arrangement between BayMark and 
KPMG, standing alone. This is because BayMark was not an 
accounting firm, and thus not a "member in public practice," 
and because the royalty BayMark was committed to pay 
KPMG was not linked to the attainment of any "specified 
finding or result" and its amount was not "dependent upon 
the finding or result" of any professional or other service. By 

lumping the two separate compensation arrangements to-
gether, neither of which violates AICPA Rule 302, amicus 
concludes that the Commission "morph[s] the Rule into 
something entirely different than [AICPA] intended to pro-
mulgate." Amicus Brief at 5.

 The plain language of Rule 302 does not forbid, as amicus 
puts it, " 'sets of relationships' but rather the performance of 
services for, or the receipt of, fees the existence or amount of 
which are contingent on particular 'findings' or 'results' of 
those services--in this case, the audit--not simply on the 
'financial success of an audit client.' " Id. at 5-6. In other 
words, the rule on its face does not cover all services provided 
to PORTA, only professional services. Or at least that is the 
way Rule 302 was understood prior to the Commission's order 
in the instant case, according to the testimony of two expert 
witnesses presented by KPMG. The Commission declined to 
find that KPMG controlled BayMark. KPMG, then, received 
only a flat fee from PORTA and did not "perform any 
professional services" for BayMark; rather, the supposed 
contingent fee here was not received from a client but was a 
royalty fee to be paid by a nonclient, BayMark. The Com-
mission does not suggest in its brief to the court that the 
Commission has previously interpreted AICPA Rule 302 in a 
manner that would reach BayMark's "success" fee or 
KPMG's royalty fee. Indeed, its own accounting expert did 
not testify that Rule 302 was to be read the way the Commis-
sion did. Nor is there anything to suggest that Congress 
intended the Commission to fill in gaps left by AICPA; it 
would be another thing if the Commission had its own rule on 
contingent fees, but all it has is its general requirement that 
accountants be independent.

 Even assuming that the text of AICPA Rule 302 is reason-
ably susceptible to the Commission's interpretation, as pro-
hibiting KPMG from receiving an income stream while it was 
auditing PORTA's financial statements that was dependent in 
part on the size of PORTA's earnings, because that interpre-
tation is novel and involves a strained reading of the rule, 
KPMG cannot be said to have had fair notice that the 
"success" fee/royalty arrangement would be deemed a prohib-

ited contingent fee under AICPA Rule 302. Cf. Checkosky v. 
SEC, 23 F.3d 452, 460-61 (D.C. Cir. 1994) (separate opinion of 
Judge Silberman). Even when the Commission's own rules 
are involved, although the Commission may broadly construe 
its rules, and because it cannot foresee every possible evasion 
of its rules, it may determine specific applications of its rules 
on a case by case basis, the court "cannot defer to the 
Commission's interpretation of its rules if doing so would 
penalize an individual who has not received fair notice of a 
regulatory violation." Upton v. SEC, 75 F.3d 92, 98 (2d Cir. 
1996) (citations omitted). Given that this due process princi-
ple applies when the rule carries only civil penalties, see id. 
(citing Village of Hoffman Estates v. Flipside, Hoffman 
Estates, Inc., 455 U.S. 489, 498-99 (1982)), we hold that the 
Commission erred in finding that KPMG had violated AICPA 
Rule 302 as a result of its arrangement with BayMark and 
BayMark's arrangement with PORTA.

 B.

 Regarding Leonard Sturm, KPMG also contends that it 
lacked fair notice it could be sanctioned based on his conduct. 
Specifically, KPMG contends that because Commission staff 
never challenged the propriety of Sturm's conduct throughout 
the administrative proceedings, for the Commission to predi-
cate its cease-and-desist order in part on Sturm's conduct 
violated administrative due process and KPMG's right to fair 
notice. Amicus AICPA protests the Commission's conclusion 
that Sturm was negligent simply for relying on the DPP's 
opinion and proceeding with the PORTA audit. The Commis-
sion maintains, however, that because KPMG failed to raise 
this issue before the Commission it is not properly before the 
court.

 Section 25(c)(1) of the Exchange Act provides that "[n]o 
objection to an order or rule of the Commission, for which 
review is sought under this section, may be considered by the 
court unless it was urged before the Commission or there was 
reasonable ground for failure to do so." 15 U.S.C. 
s 78y(c)(1). The purpose of Section 25(c)(1) is to "assur[e] 

that the Commission have had a chance to address claims 
before being challenged on them in court." Blount v. SEC, 
61 F.3d 938, 940 (D.C. Cir. 1995). Such statutory provisions 
are jurisdictional and serve as a bar to consideration by the 
court of issues not previously raised to the agency. See Sims 
v. Apfel, 530 U.S. 103, 107-08 (2000). However, the court has 
recognized that statutes containing the language of Section 
13(a), "or reasonable ground for failure to do so", include a 
safety valve. See Marine Mammal Conservancy v. Dep't of 
Agriculture, 134 F.3d 409, 412 (D.C. Cir. 1998) (citing as 
examples 15 U.S.C. s 78y(c)(1) ("reasonable ground for fail-
ure to do so"); 29 U.S.C. s 160(e) ("extraordinary circum-
stances")). See generally Hormel v. Helvering, 312 U.S. 552, 
556-59 (1941). If KPMG failed to raise the issue of Sturm's 
negligence before the Commission, the question then becomes 
whether KPMG has provided a reasonable explanation for its 
failure to challenge the Commission's reliance on Sturm's 
conduct in issuing the cease-and-desist order.

 It is clear that the negligence finding based on Sturm's 
conduct as audit partner is erroneous given the way the case 
was tried. The OCA did not challenge Sturm's conduct, and 
commented that Sturm was a "careful guy" who had been 
"kept in the dark." The ALJ concluded that Sturm had acted 
in good faith and believed that OCA staff "would not object to 
the engagements." Matter of KPMG, 71 S.E.C. Dkt. 1220, 
2000 WL 45725, at *32. Nonetheless, the Commission criti-
cized KPMG for failing to recognize the seriousness of its 
actions or inaction citing Sturm's conduct as one example. 
See Reconsideration Order at 11. In light of the absence of 
an OCA challenge to Sturm's conduct either in its OIP or in 
response to the ALJ's decision, KPMG's first notice that 
Sturm's conduct would be considered negligent came when 
the Commission issued its Order. See Order at 43. Nonethe-
less, in seeking reconsideration by the Commission, KPMG 
failed to challenge the Commission's finding as to Sturm. 
KPMG explains, however, that it was not until the Reconsid-
eration Order "that it became other than pointless to raise 
[the issue]."

 In its original opinion the Commission stated that each of 
the violations it found independently justified its cease-and-
desist order. See Order at 54. Given this, and the fact that 
the Commission found Conway, the head of DPP, to be 
negligent as well, it might have been "clearly useless" for 
KPMG to object to a sanction for Sturm's conduct. See 
Randolph-Sheppard Vendors of Am. v. Weinberger, 795 F.2d 
90, 105-06 (D.C. Cir. 1986). The question is not without 
difficulty, however. See id. Safety valves are subject to 
abuse, see, e.g., Etelson v. Office of Personnel Management, 
684 F.2d 918, 925 (D.C. Cir. 1982), and a mere losing posi-
tion--in the absence of circumstances such as an agency 
position that it is without jurisdiction to act or a very clearly 
articulated agency position, such as refusing to change a rule 
absent judicial instruction to do so--is insufficient. See Ran-
dolph-Sheppard, 795 F.2d at 105; cf. Marine Mammal Con-
servancy, 134 F.3d at 413. The Commission plausibly main-
tains on appeal both that a single violation of the type at issue 
here can suffice for issuance of a cease-and-desist order and 
that the finding that Sturm was negligent was not essential. 
Our decision leaves in place the Commission's negligence 
findings on a number of statutory and rules violations by 
KPMG. For these reasons, we need not decide whether 
KPMG's explanation brings it within Section 13(a)'s safety 
valve. The rationale underlying exhaustion requirements is 
sufficiently important that it behooves the court to avoid 
possibly expanding the "futility" exception when it is unneces-
sary to do so. See Randolph-Sheppard, 795 F.2d at 104-05; 
see also McKart v. United States, 395 U.S. 185, 193-95 (1969); 
3 R.J. Pierce, Administrative Law Treatise, s 15.2 at 970, 974 
(2002).

 C.

 KPMG also challenges the propriety of a negligence stan-
dard under Section 21C. In contesting the Commission's 
position that this issue is not properly before the court 
because it was not raised "at any point in these proceedings," 
Respondent's Br. at 35, KPMG responds that because the 
Commission has previously disclaimed authority to regulate 

accountants other than pursuant to Rule 102(e) (and its 
predecessors), and the prosecution proceeded on that basis, 
its challenge to a negligence standard for Rule 102(e) is 
properly understood as a challenge to a negligence standard 
however the Commission might seek to regulate accountants. 
That may be somewhat of a stretch. But, in its brief before 
the Commission, KPMG argued that the Division was seeking 
to impose strict liability under Rule 21C for independence 
violations and that such constituted "an unwarranted de facto 
expansion of the Division's powers to sanction professionals." 
KPMG noted that under this approach, Rule 102(e)--at issue 
in Checkosky v. SEC, 23 F.3d 452, 455 (D.C. Cir. 1994)--
would never need to be invoked and any violation of the rules 
would justify a cease-and-desist order. This was sufficient to 
alert the Commission to the challenge to its authority to enter 
a cease-and-desist order on the basis of a negligence stan-
dard. See Blount v. SEC, 61 F.3d 938, 940 (D.C. Cir. 1995); 
Dep't of Treasury v. FLRA, 762 F.2d 1119, 1122 (D.C. Cir. 
1985). The Commission, in fact, was alerted to the issue, 
ruling that negligence is sufficient to establish liability under 
Section 21C, and specifically rejecting KPMG's due process 
claim based on its reading of the court's holding in Checkosky. 
See Order at 38-39 & n.99.

 On the merits, KPMG's contention that the Commission 
cannot use Section 21C "to bootstrap" its authority to regu-
late accountants fails on several grounds. First, Rule 102(e) 
provides that the Commission may sanction accountants in a 
particular manner. The rule provided at the time of the 
administrative proceeding that the Commission could "deny, 
temporarily or permanently, the privilege of appearing or 
practicing before it" to any accountant who had "engaged in 
unethical or improper professional conduct" or "willfully vio-
lated ... any provision of the Federal securities laws." 17 
C.F.R. s 201.102(e)(1996). No such barring order was en-
tered here, and there is nothing in the rule itself to indicate 
that it is the exclusive means for addressing accountants' 
conduct. KPMG's contention that the Commission viewed 
Rule 102(e) to be the exclusive basis for disciplinary actions 
against accountants is an overstatement. In Touche Ross & 

Co. v. SEC, 609 F.2d 570 (2d Cir. 1979), on which KPMG 
relies, the court made no more than a historical statement 
that the rule was "the basis for a number of disciplinary 
proceedings" in rejecting a challenge to the Commission's 
authority to discipline accountants and others. Id. at 578. 
Commission decisions cited by KPMG are not to the contrary. 
See, e.g., Matter of Carter, 47 S.E.C. 471 (1981). Nor is the 
fact that in Checkosky the Commission declined to take a 
position on whether negligence was sufficient under Rule 
102(e) dispositive, as KPMG appears to maintain; a Section 
21C issue was simply not before the court.

 Second, the premise of KPMG's view that the Commission's 
invocation of Section 21C is no more than a way to circumvent 
the scienter requirement of Rule 201(e) is flawed. There is 
no support for the position that the culpability standards 
governing Rule 102(e) proceedings can be applied with equal 
force in Section 21C proceedings. The nature of the two 
proceedings is different. As the Commission points out, "one 
is a professional disciplinary proceeding designed to protect 
the integrity of the Commission's process while the other is a 
law enforcement proceeding," each involving "fundamentally 
different remedies...." Respondent's Br. at 46. See Check-
osky, 23 F.3d at 456 (separate opinion of Judge Silberman); 
id. at 467, 471 (separate opinion of Judge Randolph). 
KPMG's view that it was only by disclaiming jurisdiction to 
sanction accountants as primary violators of securities law 
that the Commission was able to justify Rule 102(e) as an 
administrative disciplinary rule impales on the same flawed 
premise. Likewise, KPMG's position that the federal court 
has exclusive jurisdiction over actions to punish violations of 
the securities laws under 15 U.S.C. s 78aa fails to distinguish 
between the Commission's authority to discipline profession-
als from its substantive enforcement functions. See Checko-
sky, 23 F.3d at 456 (separate opinion of Judge Silberman).

 Third, the Commission found that KPMG violated the 
independence requirement of Rule 2-02(b)(1) of Regulation 
S-X. See Order at 36. KPMG acknowledges that the Com-
mission has used the independence requirement as a "base-
line for assessing the propriety of an accountant's conduct 

under its rules of practice." Petitioner's Br. at 26. In other 
words, the Commission has interpreted the independence 
requirements of Regulation S-X to apply to accountants. 
The very cases KPMG cites include Matter of Alan S. Gold-
stein, et al. 57 S.E.C. Dkt. 1419 & 1421, 1994 WL 499304 & 
1994 WL 499312 (Sept. 6, 1994), where the Commission both 
censured an accountant under the predecessor to Rule 102(e) 
and enjoined the accountant under Section 21C from causing 
violations of Section 17(a)(1) and Rule 18a-5(d) by virtue of 
lack of independence. KPMG's implicit argument that impo-
sition of discipline is a necessary precondition to enforcement 
under Section 21C finds no support in the authorities on 
which it relies.

 Moreover, the Commission was virtually compelled by Con-
gress' choice of language in enacting Section 21C to interpret 
the phrase "an act or omission the person knew or should 
have known would contribute to such violation" as setting a 
negligence standard. See Order at 38. KPMG contends that 
the court should give no deference to the Commission's 
interpretation of Section 21C as regulating accounting negli-
gence as it is an unexplained and unsupportable usurpation of 
authority. Yet the plain language of Section 21C invokes, as 
the Commission stated, "classic negligence language." Order 
at 38 (citing Davis v. Monroe County Bd. of Educ., 526 U.S. 
629, 642 (1999); United States v. Finkelstein, 229 F.3d 90, 95 
(2d Cir. 2000)). To the extent that KPMG sought reconsider-
ation by the Commission on the ground that the Commission 
sanctioned it for negligent conduct based on an evidentiary 
hearing held under a scienter standard, we see no occasion to 
elaborate on the Commission's reasoning. See Reconsidera-
tion Order at 3-10. In denying reconsideration, the Commis-
sion pointed to the administrative record where the ALJ had 
ruled that only the misconduct charged under Rule 102(e) 
would be governed by a scienter standard. The Commission 
also noted that the Division had made clear that it would 
premise its litigation of the charges under Section 21C on a 
negligence standard. KPMG has no response.

 D.

 KPMG further contends that it was improper to impose a 
cease-and-desist order on it for causing a violation of Section 
13(a) in the absence of such an order against the primary 
violator, PORTA, and that it cannot be sanctioned as a 
primary violator of the securities laws under Rule 2-02(b) of 
Regulation S-X because that provision imposes enforceable 
duties only on registrants, not accountants. Review of the 
record before the court reveals that KPMG failed to press 
these objections before the Commission. Consequently, the 
court lacks jurisdiction to address them.

 The record does not show that any of KPMG's legal briefs 
before the ALJ or the Commission addressed or mentioned 
the issue of Commission's authority to issue a cease-and-
desist order against causing or secondary violators without 
sanctioning primary violators. The Commission's brief to this 
court makes this point, and KPMG did not contest the point 
in its reply brief. Because the Commission has not had an 
opportunity to address KPMG's primary violator contention, 
it is not properly before the court.

 The record further indicates that KPMG effectively aban-
doned any contention that Regulation S-X does not apply 
directly to accountants. KPMG mentioned the argument in 
its post-trial legal brief to the ALJ when it stated, "In any 
event, Regulation S-X was promulgated to effectuate the 
registration requirements of Section 13(a), 15 U.S.C. 
s 78m(a), which, by its terms, applies to issuers of securities, 
not their auditors." KPMG made no attempt to elaborate on 
this comment and made no other mention of this point 
elsewhere in the proceedings. An argument cannot be mere-
ly intimated or hinted at to be raised; it must be "pressed" to 
be preserved. Hays v. Sony Corp., 847 F.2d 412, 420 (7th 
Cir. 1988); In re Fairchild Aircraft Corp., 6 F.3d 1119, 1128 
(5th Cir. 1993); see also In Re Espino, 806 F.2d 1001, 1002 
(11th Cir. 1986). Because KPMG made no mention of this 
issue in its brief to the Commission or its motion for reconsid-
eration, all indications are that the argument was either 
dropped or that it was not truly an argument that KPMG had 

ever pressed. Where a litigant "seem[s] to abandon its 
argument" the court will hold that "the agency did not have a 
fair opportunity to address this argument." Busse Broad-
casting Corp v. FCC, 87 F.3d 1456, 1461 (D.C. Cir. 1996). 
Given Section 25(c)(1)'s purpose to afford the Commission the 
first opportunity to address claims, see Blount, 61 F.3d at 
940, we cannot conclude that KPMG's passing reference to an 
issue that was later abandoned gave the Commission that 
opportunity.

 III.

 KPMG challenges the cease-and-desist order as improper 
on a variety of grounds, only one of which we conclude has 
apparent merit. KPMG makes much of the fact that Con-
gress referred to the cease-and-desist authority of other 
agencies, see S. Rep. No. 101-337, at 19; H.R. Rep. No. 101-
616, at 23, in contending that Section 21C gave the Commis-
sion no new authority to regulate professional conduct. But 
KPMG cites no authority that other agencies had declined to 
issue cease-and-desist orders as part of their enforcement 
powers against a person who, although a professional, had 
been found to violate the relevant laws either directly or by 
causing another to violate the laws. In fact, the converse is 
true. See, e.g., Matter of Phillip C. Zarcone, CFTC Dkt. No. 
93-18, 1993 WL 302633, at *1 (Aug. 10, 1993) (accountant); 
Matter of California Dental Ass'n, 1995 WL 452990 (July 17, 
1995), rev'd on other grounds, California Dental Ass'n. v. 
FTC, 224 F.3d 942 (9th Cir. 2000); Matter of Superior Court 
Trial Lawyers Ass'n, 107 F.T.C. 510 (June 23, 1986), affirmed 
on other grounds, Superior Court Trial Lawyers Ass'n v. 
FTC, 493 U.S. 411 (1990). Moreover, KPMG does not dispute 
that under Section 21C the Commission may impose sanctions 
for such violations, and never argued to the Commission that 
it lacked authority to hold KPMG accountable for misrepre-
senting its independence in its Independent Auditor's Report.

 The Commission's cease-and-desist order required that 
KPMG cease and desist from committing present or future 

 violations of Rule 2-02(b) of Regulation S-X, or being the 
cause of any present or future violation of Section 13(a) of the 
Exchange Act or Rule 13a-1 thereunder due to an act or 
omission that KPMG knows or should know will contribute to 
such violation, by having any transactions, interests or rela-
tionships that would impair its independence under Rule 2-01 
of Regulation S-X or under GAAS. In addressing KPMG's 
challenges to the order, our review of the Commission's 
choice of a sanction is limited by both the Administrative 
Procedure Act ("APA"), 5 U.S.C. s 706(2)(A) (2000), and 
Supreme Court precedent. See Wonsover v. SEC, 205 F.3d 
408, 412 (D.C. Cir. 2000). The APA limits our inquiry to 
whether the Commission's sanction was "arbitrary, capricious, 
an abuse of discretion, or otherwise not in accordance with 
law." 5 U.S.C. s 706(2)(A); Wonsover, 205 F.3d at 213. The 
Supreme Court has long instructed that the Commission's 
choice of sanction shall not be disturbed by the court unless 
the sanction is either "unwarranted in law or is without 
justification in fact." American Power & Light v. SEC, 329 
U.S. 90, 112-13 (1946); Wonsover, 205 F.3d at 213 (citations 
omitted).

 A.

 KPMG contends that the cease-and-desist order is over-
broad because it bears no reasonable relation to the violations 
found. KPMG also contends that the order is unduly vague 
because by prohibiting all relationships that violate GAAS, 
the order incorporates broad, open-ended standards that 
require interpretation and exposes KPMG to the possibility of 
punishment for making good-faith but incorrect judgments 
about compliance. Neither contention is persuasive.

 Section 21C authorizes the entry of a cease-and-desist 
order to prohibit "any future violation of the same provision" 
found to have been violated in the instant case. 15 U.S.C. 
s 78u-3 (emphasis added). The provisions at issue are Rule 
2-02(b) of Regulation S-X, 13(a) of the Exchange Act, and 
Rule 13a-1 promulgated thereunder. There is, consequently, 
no "sweeping order to obey the law" as KPMG contends, 

because the terms of the order are limited to these provisions. 
Further, the Commission stated that the order "extends only 
to violative acts 'the threat of which in the future is indicated 
because of their similarity or relation to those [past] unlawful 
acts.' " Order at 47 n.121. The order thus extends only to a 
subset of the violations comprehended by the rules and 
statutory provisions involved, namely those that are indepen-
dence related. By concluding that the seriousness of 
KPMG's misconduct, combined with the flaws in its mode of 
assessing independence, created a serious risk of future inde-
pendence-impairing relationships beyond the two circum-
stances at issue, see Order at 54, the Commission justified an 
order aimed at preventing violations flowing from a broader 
array of independence impairments than the precise ones 
found. In so doing, it cannot be said that the order has "no 
reasonable relation to the unlawful practices found to exist." 
FTC v. Colgate Palmolive Co., 380 U.S. 374, 394-95 (1965). 
The order is unlike those condemned in the cases on which 
KPMG relies, such as ITT Continental Baking Co. v. FTC, 
532 F.2d 207, 221 (2d Cir. 1976), and Joseph A. Kaplan & 
Sons, Inc. v. FTC, 347 F.2d 785, 789-90 (D.C. Cir. 1965), 
where the cease-and-desist orders extended beyond the na-
ture of violations found. It also is unlike the orders in NLRB 
v. Express Pub. Co., 312 U.S. 426, 433 (1941), or Swanee 
Paper Corp. v. FTC, 291 F.2d 833, 838 (2d Cir. 1961), which 
were not limited to related activities. Chrysler Corp. v. FTC, 
561 F.2d 357 (D.C. Cir. 1977), is distinguishable because in 
that case the Federal Trade Commission conceded that the 
marketing violations were "unintentional," "not continuing," 
and "confined to two out of fourteen advertisements," thus 
providing less justification for a more wide-ranging ban. Id. 
at 364. Country Tweeds, Inc. v. FTC, 326 F.2d 144 (2d Cir. 
1964), is similarly distinguishable given the voluntary cessa-
tion of the offending conduct long before the complaint was 
filed and the likelihood that the offending party would not 
resume such or related conduct. Id. at 149.

 Neither is there any requirement on the part of the Com-
mission to tailor its order more narrowly to specific types of 
violations of the provisions involved. The "any future viola-

tion" language in Section 21C makes this clear and the 
"reasonable relationship" requirement does not impose such a 
limit. As the Supreme Court observed in FTC v. Ruberoid 
Co. 343 U.S. 470 (1952), cease-and-desist authority is "not 
limited to prohibiting the illegal practice in the precise form 
in which it is found to have existed in the past. If the 
Commission is to attain the objectives Congress envisioned, it 
cannot be required to confine its road block to the narrow 
lane the transgressor has traveled; it must be allowed effec-
tively to close all roads to the prohibited goal, so that its 
order may not be by-passed with impunity." Id. at 473. 
What KPMG would appear to suggest is required--namely an 
order so narrow that in the absence of copy-cat violations 
there would be no possibility of a violation of the order--
ignores the expansive language used by Congress. Given the 
Congressional purpose of empowering the Commission "to 
curb a wider range of securities violations" in an effort to 
"combat recidivism," S. Rep. No. 101-337, at 1 (1990); see H. 
Rep. No. 101-616, at 23-24, the Commission could reasonably 
interpret Section 21C as empowering it to issue orders limit-
ed only by the specific provisions of law or regulations found 
to have been violated.

 Consequently, the record belies KPMG's contentions that 
the order bears no reasonable relation to the violations found 
and was entered without regard to the nature of the infrac-
tion or the good-faith of the accountant involved. The judg-
ment underlying the Commission's decision that the indepen-
dence violations were of an order of seriousness that KPMG 
failed to appreciate is the type of agency expertise to which 
courts defer. See Svalberg v. SEC, 876 F.2d 181, 1884 (D.C. 
Cir. 1989); see also Blinder, Robinson & Co. v. SEC, 837 F.2d 
1099, 1107 (D.C. Cir. 1988).

 KPMG's challenge to the cease-and-desist order on vague-
ness grounds is similarly without merit. KPMG contends 
that because GAAS standards are "vague and open-ended" 
the Commission could not properly enjoin compliance with 
broad prohibitions that require subjective interpretation and 
complex judgments over which reasonable professionals may 
disagree. This court has observed, in light of the severity of 

monetary penalties under antitrust laws, that cease-and-
desist orders should be "sufficiently clear and precise to avoid 
raising serious questions as to their meaning and application." 
Joseph A. Kaplan, 347 F.2d at 790 (quoting FTC v. Henry 
Broch & Co., 368 U.S. 360, 367-68 (1962)). KPMG neverthe-
less fails to show that such serious questions will necessarily 
arise to its detriment.

 Section 21C allows for the order to enjoin the "causing [of] 
such violation and any future violation of the same provision, 
rule, or regulation." That is all the order did; it ordered 
KPMG to "cease and desist from committing any violation or 
future violation of Rule 2-02(b) of Regulation S-X, or from 
being a cause of any violation or future violation of Section 
13(a) of the Securities Exchange Act of 1934 or Rule 13a-1 
thereunder." The order merely tracks the statutory lan-
guage and inserts the relevant provisions. Further, although 
GAAS may be a complex scheme and reasonable professionals 
may differ as to its application to discrete sets of facts, it is 
not a set of indefinite and open-ended standards subject to 
the whims of the Commission. Rather, as with most provi-
sions of the law, there are broad areas of clarity and instances 
closer to the line where there will be some doubt. See 
generally Checkosky, 23 F.3d at 472-73 & n.7 (separate 
opinion of Judge Randolph); cf. Shalala v. Guernsey Memo-
rial Hospital, 514 U.S. 87, 100-01 (1995). The rule, as 
amended, effective February 2001, Exchange Act Rel. No. 
43602, 2000 WL 1726933, at *1, 73 S.E.C. Dkt. 2601 (Nov. 21, 
2000), includes examples of when independence will be found 
lacking, and while non-exclusive, the examples nonetheless 
inform the general standard. See id. at *35. Although 
absolute precision is impossible, even with an objective stan-
dard, see Bristol-Myers Co. v. FTC, 738 F.2d 554, 560 (2d 
Cir. 1984), KPMG fails to show that it will have "difficulty 
applying the Commission's order to the vast majority of their 
contemplated future [actions]." Colgate-Palmolive, 380 U.S. 
at 394. But, as KPMG is aware, if a situation arises where 
KPMG is "sincerely unable to determine whether a proposed 
course of action would violate the present order, [KPMG] can 
... oblige the Commission to give ... definitive advice as to 

whether [the] proposed action if pursued, would constitute 
compliance with the order." Id. If KPMG has a disagree-
ment with the Commission as to its interpretation of a GAAS 
standard, it will have the opportunity to make the case for its 
interpretation in any contempt proceeding the Commission 
may institute to adjudicate an alleged violation of the order.

 B.

 More problematic, however, is KPMG's contention that in 
entering the cease-and-desist order, the Commission created 
an improper presumption that a past violation is sufficient 
evidence of "some risk" of future violation, and applied it in 
an arbitrary and capricious manner whereby it is, "in essence, 
irrebutable," ignoring KPMG's evidence of serious remedia-
tion and the ALJ's finding there was no future threat of 
harm. In seeking reconsideration by the Commission, KPMG 
argued that the Commission had failed to comply with the 
standard that it had established for issuance of a cease-and-
desist order--namely some likelihood of future violation 
based on proof of some continuing or threatened conduct by 
KPMG creating an increased likelihood of future violations--
and that there was no such evidence. The plain language of 
Section 21C, as well as the legislative history, see S. Rep. No. 
101-337, at 18; H.R. Rep. No. 101-616, at 24, undermine 
KPMG's contention that the Commission erred in proceeding 
on the basis of a lower risk of future violation than is required 
for an injunction. However, the precise manner in which the 
standard is met is unclear from the Commission's analysis on 
reconsideration.

 In its original opinion, the Commission acknowledged that:

 in imposing sanctions, we traditionally have balanced a 
 variety of mitigating and aggravating circumstances, 
 such as the harm caused by the violations, the serious-
 ness of the violations, the extent of the wrongdoer's 
 unjust enrichment, and the wrongdoer's disciplinary rec-
 ord. The question this case poses are whether, as a 
 matter of either statutory command or in the exercise of 
 our broad discretion, we will require some showing of 
 
 likelihood of future violations before issuing a cease-and-
 desist order, and how that showing may be made.
 
Order at 46. The Commission had stated that a single 
violation sufficed to show the necessary likelihood. See id. at 
54. On reconsideration, the Commission explained that, con-
sistent with the history leading up to the enactment of 
Section 21C, it had applied a standard for showing a risk of 
future violations that was significantly less than that required 
for an injunction. See Reconsideration Order at 10. To the 
Commission, "although 'some risk' of future violations is 
necessary, it need not be very great to warrant issuing a 
cease-and-desist order and that in the ordinary case and 
absent evidence to the contrary, a finding of past violation 
raises a sufficient risk of future violation." Id. Disclaiming 
that issuance of a cease-and-desist order is "automatic" on a 
finding of past violation, the Commission stated that "[a]long 
with the risk of future violations, we will continue to consider 
our traditional factors in determining whether a cease-and-
desist order is an appropriate sanction based on the entire 
record." Id.

 The Commission proceeded to reject KPMG's argument 
that the violative conduct was isolated, inadvertent, and un-
connected to any ongoing conduct or engagement. Rather, 
the Commission explained, that although "the isolated nature 
of the conduct tended to counsel against relief.... we did not, 
and do not, consider the lack of care at senior levels that 
attended the independence determinations in this case to 
have been merely inadvertent or to be 'unconnected' to any 
ongoing conduct or engagement." Id. at 11. The risk of 
future violations arises here, the Commission explained, 
"from the manifestly inadequate level of scrutiny given to 
independence issues and [KPMG's] consistent failure to rec-
ognize the seriousness of this misconduct." Id. The Com-
mission then noted that the loan to Olson, an officer of a 
registrant, was, in the words of a witness, "an absolute 
blatant out-and-out violation" of GAAS. Id. More specifically, 
the Commission stated:

 We found that this impairment, as well as the impair-
 ment flowing from [KPMG's] right to receive a fee 
 contingent on the registrant's success [in violation of 
 AICPA Rule 302], resulted in serious violations and that 
 [KPMG] failed to appreciate that seriousness. We also 
 determined that the violations flowed from the negligent 
 failures of the head of [KPMG]'s DPP [Conway] and the 
 audit partner [Sturm] to inform themselves about facts 
 material to specific issues about independence attending 
 [KPMG]'s audit engagement--when both had questions 
 or concerns about the propriety of the audit and had 
 ready access to relevant information. These findings, as 
 well as others detailed in our opinion, are based on the 
 record as a whole and are more than adequate to support 
 our conclusion that there was not just 'some' risk but 
 a 'serious' risk of future violation, which, together with 
 the traditional sanctioning factors we considered, fully 
 warranted the cease-and-desist relief we issued. (Empha-
 sis added)
 
Id. at 11.

 The Commission's statement on reconsideration suggests 
that it may no longer consider, as it initially made clear, see 
Order at 54, that any one of its findings of a violation, 
standing alone, would suffice under its standard to enter a 
cease-and-desist order. At oral argument counsel for the 
Commission argued that the language in the Reconsideration 
Order is insufficiently precise to suggest that the Commission 
had changed its mind. In truth, the Reconsideration Order 
leaves this unclear. Nevertheless, in light of the Commis-
sion's having found several serious violations--all but one of 
which we affirm--we conclude that a remand is unnecessary. 
See McNulty & Co. v. Sec'y of Labor, 283 F.3d 328, 339 (D.C. 
Cir. 2002).

 The Commission stated in its original order that either the 
outstanding loan or the "success" fee/royalty arrangement, 
standing alone, compromised KPMG's independence and that 
"each of the violations we have found today independently 
calls for cease-and-desist relief." Order at 54. On reconsid-

eration, the Commission continued to find multiple violations 
of sufficient seriousness to warrant cease-and-desist relief 
under either a "some-risk-of-future-violation" standard or a 
"serious-risk-of-future-violation" standard. Reconsideration 
Order at 11. Removing the Commission's erroneous finding 
that KPMG violated AICPA Rule 302 still leaves what was 
characterized as "an absolute blatant out-and-out violation" of 
GAAS in the form of the loan to Olson. Order at 30; 
Reconsideration Order at 11. Similarly, removing the al-
leged negligence of Sturm, who was perhaps the only "careful 
guy" involved in the "strategic alliance" between KPMG and 
BayMark, still leaves, at the very least, "the negligence of the 
head of [KPMG's] Department of Professional Practice," 
Conway, who, according to the Commission, rendered a 
"manifestly inadequate level of scrutiny ... to independence 
issues" when scrutiny was most needed. Reconsideration 
Order at 11. Under these circumstances, and consistent with 
remanding only when we conclude "that there is a significant 
chance that but for [an] error the agency might have reached 
a different result," McNulty, 283 F.3d at 339 (citing Enviro-
care of Utah, Inc. v. Nuclear Regulatory Comm'n, 194 F.3d 
72, 79 (D.C. Cir. 1999)), we conclude that "[i]t would be 
meaningless to remand." NLRB v. Wyman-Gordon, 394 
U.S. 759, 766 n.6 (1969).

 IV.

 Accordingly, because KPMG lacked fair notice of the Com-
mission's interpretation of AICPA Rule 302, we reverse the 
Commission's finding that the "success" fee/royalty arrange-
ment violated that rule. As to KPMG's contention that it also 
lacked fair notice it could be sanctioned on the basis of 
Sturm's conduct, we conclude, in view of our disposition and 
the Commission's position on appeal, that we need not decide 
whether KPMG's failure to challenge the Commission's find-
ing as to Sturm falls within the safety valve of Section 
25(c)(1). We affirm the Commission's determination that 
negligence is an appropriate basis for violations underlying a 
Section 21C cease-and-desist order, and reject KPMG's con-
tentions that the order is overbroad and vague. Because not 

raised before the Commission, we do not address KPMG's 
challenges to the Commission's determinations that it may 
impose sanctions under Section 21C on secondary violators 
without also sanctioning primary violators, and that Regula-
tion S-X may apply directly to accountants. Finally, we 
conclude that a remand to allow the Commission to clarify 
whether simply one or a combination of two or more of the 
violations it found suffice to meet its standard for finding a 
risk of future violation to enter a cease-and-desist order is 
unwarranted in light of the Commission's alterative findings 
of violations in its original order. We therefore deny 
KPMG's petition for review.

 Randolph, Circuit Judge, dissenting: I believe the SEC's 
cease and desist order should be vacated and remanded to the 
agency.

 In its first opinion, the SEC nodded in favor of the need to 
find some risk of future misconduct as a precondition to a 
cease and desist order. But it then turned around and held 
that "[a]bsent evidence to the contrary, a finding of violation 
raises a sufficient risk of future violation." KPMG challenged 
this conclusion, and on reconsideration the SEC expressly 
disclaimed any notion that a cease and desist order is "auto-
matic" after a violation of the securities laws. The SEC said 
it will continue to consider "our traditional factors" before 
imposing a cease and desist order, which, according to the 
SEC's first opinion, appear to be "the harm caused by the 
violations" (here none), "the seriousness of the violations," 
"the extent of the wrongdoer's unjust enrichment" (here 
none), and "the wrongdoer's disciplinary record" (as acknowl-
edged at oral argument, meager at best). In its opinion on 
reconsideration, the SEC wrote that its "findings"--(1) the 
loan to Olson; (2) the contingent fee arrangement; (3) 
KPMG's lack of remorse; and (4) the negligence of the 
KPMG partners including Conway and Sturm, all of which it 
discussed in the prior sentences--were "more than adequate 
to support [the SEC's] conclusion that there was ... a 
serious risk of future violation, which, together with the 
traditional sanctioning factors we considered, fully warranted 
the cease-and-desist relief [the SEC] issued."

 The SEC's contingent fee finding was clearly erroneous. 
On its face, AICPA's Rule 302 covers not all services provided 
to Porta Systems, but only professional services. Rules of 
Professional Conduct s 302 (American Inst. of Certified 
Pub. Accountants 2001). The SEC's interpretation of the 
rule receives no deference because we have no hint that 
Congress intended the SEC to fill in gaps left by AICPA. It 
would be another thing entirely if the SEC had its own rule 
on contingent fees, but all the agency has is its general 
requirement that accountants be independent. See 17 C.F.R. 
s 210.2-01.

 It is also clear that the SEC's negligence finding based on 
Sturm's conduct is erroneous given the way the case was 

tried. There was no charge of wrongdoing regarding Sturm. 
At trial before the Administrative Law Judge, the SEC 
enforcement staff called Sturm "a careful guy" who was "kept 
in the dark." As to KPMG's failure to bring this objection to 
the SEC, we do not require that a party raise arguments 
when it would be futile to do so. See, e.g., Omnipoint Corp. 
v. FCC, 78 F.3d 620, 635 (D.C. Cir. 1996). The SEC's original 
opinion explicitly stated that each of its four reasons for 
issuing the order independently justified its cease and desist 
order. It was only on reconsideration that the SEC made an 
about-face and lumped all the findings together. Given this 
posture, and the fact that the SEC found Conway to be 
negligent as well, it would have been "clearly useless" for 
KPMG to object to imposition of a sanction for Sturm's 
conduct in its motion for reconsideration. See Randolph-
Sheppard Vendors of Am. v. Weinberger, 795 F.2d 90, 105-06 
(D.C. Cir. 1986).

 The reconsideration order criticizes KPMG for its "consis-
tent failure to recognize the seriousness" of its violations. 
True, KPMG mounted a vigorous defense to the SEC's case, 
but those charged with misconduct have a right to defend 
themselves. Also, it is arbitrary for the SEC to fault KPMG 
for not recognizing the seriousness of Sturm's so-called mis-
conduct when the SEC enforcement staff praised his behav-
ior.

 In light of the SEC's errors in finding a contingent fee 
arrangement and in finding Sturm negligent, the cease and 
desist order cannot be sustained. We should have vacated 
the order and sent the case back so the SEC could decide 
whether it still wants to issue the order without these legs of 
the table.

 I would therefore not reach any of the other issues in the 
case.