**Kevin UPTON, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 287, Docket 95–4044.

United States Court of Appeals, Second Circuit.

Argued Sept. 26, 1995.

Decided Jan. 18, 1996.

Melvin A. Brosterman, New York City (Stroock & Stroock & Lavan, David Bolton, of counsel), for Petitioner.

Susan Ferris Wyderko, Senior Litigation Counsel, Securities and Exchange Commission, Washington, DC (Paul Gonson, Solicitor, Simon M. Lorne, General Counsel, Eric Summergrad, Principal Assistant General Counsel, Christopher Paik, Senior Counsel, of counsel), for Respondent.

Before: LUMBARD, WALKER, and CALABRESI, Circuit Judges.

LUMBARD, Circuit Judge:

Kevin Upton petitions for judicial review, pursuant to section 25(a)(1) of the Securities Exchange Act, 15 U.S.C. § 78y(a)(1), of an order of the Securities and Exchange Commission censuring him for failing reasonably to supervise a subordinate employee who aided and abetted a violation of Rule 15c3–3(e), the Commission's Customer Protection Rule. 17 C.F.R. § 240.15c3–3(e). The Rule is designed to prevent broker-dealers from using funds or securities held on behalf of customers to finance proprietary and other non-customer transactions, by requiring that the broker-dealer keep a separate bank account for the benefit of customers, based on a weekly calculation. The Rule begins by stating that every registered broker-dealer

> shall maintain with a bank or banks at all times ... a "Special Reserve Bank Account for the Exclusive Benefit of Customers" ... and it shall be separate from any

other bank account of the broker or dealer. Such broker or dealer shall at all times maintain in such Reserve Bank Account, through deposits made therein, cash and/or qualified securities in an amount not less than the amount computed in accordance with the formula set forth in [Rule 15c3–3a].

17 C.F.R. § 240.15c3–3(e)(1). Unless a broker-dealer falls into a very limited exception (which does not apply here), the Rule specifies that

> [c]omputations necessary to determine the amount required to be deposited as specified in paragraph (e)(1) of this section shall be made weekly, as of the close of the last business day of the week, and the deposit so computed shall be made no later than 1 hour after the opening of banking business on the second following business day.

17 C.F.R. § 240.15c3–3(e)(3). The actual computation of the amount of the deposit is done according to a complex formula found in Rule 15c3–3a. In general though, the deposit is the excess of "customer credits" over "customer debits" as defined in the Rule.[1]

From May 1985 to December 1989, Kevin Upton was chief financial officer of Financial Clearing and Services Corporation ("FiCS"), a now-defunct brokerage firm. Beginning in July 1988, Upton assumed responsibility for supervising FiCS's money management department, headed by John Dolcemaschio. During fifty-eight of the sixty weeks between April 8, 1988 and May 26, 1989, the money management department paid down loans collateralized by customer securities just before the weekly Rule 15c3–3(e) computation and replaced them with unsecured loans; on the next business day, FiCS reinstated the customer-secured loans. As a result of this paydown practice, FiCS reduced its weekly reserve requirement by as much as $40 million.

On October 21, 1991, the Commission issued an order instituting public proceedings against Upton and Dolcemaschio. Dolcemas-

---

**1.** "Customer credits" generally represent customer funds held by the broker-dealer or funds obtained by lending or hypothecating customer securities in the broker-dealer's possession. "Customer debits" are predominantly funds owed to the broker-dealer by its customers. *See* 17 C.F.R. § 240.15c3–3a.

chio consented to an order imposing sanctions. On May 18, 1993, after an evidentiary hearing and post-hearing briefing, an Administrative Law Judge found that FiCS's paydown practice violated Rule 15c3–3(e) and that Upton had failed reasonably to supervise Dolcemaschio with a view toward preventing a Rule 15c3–3(e) violation. Accordingly, the judge ordered that Upton be censured. On January 30, 1995, the Commission issued a final decision and order upholding the judge's findings and affirming his choice of sanctions. This petition followed.

## I.

Kevin Upton has been employed in the securities industry since 1967, when he received a bachelor's degree in finance and accounting from Pace College. He began his career as a finance coordinator and later assistant compliance coordinator for the New York Stock Exchange. After obtaining an MBA from St. John's University in 1970, he left the Exchange in 1971 and worked with a number of brokerage firms in various capacities, principally in the areas of compliance and financial responsibility.

In May 1985, Upton became chief financial officer of FiCS. As chief financial officer, Upton was responsible for overseeing FiCS's internal accounting. Upton later became supervisor of the new accounts department and the margin department as well. In November 1985, Upton was given responsibility over FiCS's money management department, although the department was reassigned to another supervisor one year later.

In February 1988, FiCS's parent corporation, Security Pacific Corporation, a bank holding corporation, sold FiCS to Integrated Resources Life Insurance Company. Prior to the sale, FiCS had access to a virtually unlimited unsecured line of credit from Security Pacific National Bank ("SPNB"), another subsidiary of Security Pacific. After the sale, SPNB limited its unsecured line of credit to FiCS but provided FiCS with a loan facility collateralized by customer securities.

Confronted with this reduced ability to obtain unsecured financing, John Dolcemaschio, the head of FiCS's money management department, began using SPNB's customer-secured credit line to finance FiCS's routine business. Such loans, however, were considered "customer credits" under Rule 15c3–3a and required FiCS to increase its reserve requirement. Beginning on April 8, 1988 and continuing through May 26, 1989, Dolcemaschio implemented the following weekly routine: FiCS substantially paid down loans secured by customer securities, ranging from $4 million to $52 million, just before the weekly Rule 15c3–3(e) computation and replaced them with unsecured loans at a higher interest rate. The next business day, FiCS substantially paid down the unsecured loans and reinstated the customer-secured loans. FiCS performed this substitution fifty-eight of the sixty weeks in question,[2] reducing its weekly reserve requirement by $20 million on average and by as much as $40 million in some weeks.

It is undisputed that FiCS complied with the literal terms of the Rule at all times. In fact, FiCS's paydown practice was standard procedure at several other brokerage firms, including two prior firms where Dolcemaschio had worked before coming to FiCS. The Commission, however, had already begun to investigate the practice, and on March 30, 1988, issued a consent order imposing sanctions on a broker-dealer engaged in such customer loan substitutions. *See In re Underwood, Neuhaus & Co.,* Exchange Act Release No. 25,531 (Mar. 30, 1988), 40 S.E.C. Docket 785.

Upton was reappointed supervisor of the money management department in July 1988, approximately three months after the paydown practice began. Although Upton had never been responsible for supervising a Rule 15c3–3(e) computation prior to working at FiCS, he had attended a discussion on the Rule at an Institute of Finance seminar. He knew about FiCS's customer-secured loan facility and was responsible for approving any adjustments to the Rule 15c3–3(e) account.

**2.** Because Upton required FiCS to reserve funds. in excess of FiCS's Rule 15c3–3 computation (on average $6 million dollars per computation day from July 22, 1988 through May 26, 1989), FiCS's reserve was inadequate only during 53 of the weeks in question.

As chief financial officer, he reviewed the firm's monthly Financial and Operational Combined Uniform Single (FOCUS) reports, the basic financial and operational report required of broker-dealers by the New York Stock Exchange, which included Rule 15c3–3(e) computations. He also received the firm's daily profit and loss report, which beginning in January 1989 listed the firm's customer-secured credit facility as a separate line item.

In November 1988, Colette Rex, the assistant manager of the money management department, was informally advised by an NYSE examiner, Mon Eng, that the paydown practice was questionable and should be stopped. Although Rex instructed her subordinates to discontinue the loan substitutions, her instructions were countermanded by Dolcemaschio, who remarked that "everybody on the Street does it and if they cite us, they have to cite everybody." Rex unsuccessfully attempted to inform Upton of her conversation with Eng and the problems with the paydown practice on several occasions.

In May 1989, Upton received a telephone call from the Commission staff advising him that the paydown practice violated the spirit of Rule 15c3–3(e). Upton immediately instructed the money management department to stop paying down customer loans on the Rule 15c3–3(e) computation date. Several months later, on August 23, 1989, the Exchange circulated Interpretation Memo 89–10, in which for the first time it advised its members and member organizations that the paydown practice might violate Rule 15c3–3(e). New York Stock Exchange, *Broker–Dealer Censured for Violation of SEC Rule 15c3–3 and Discussion of the Intent and*

*Objective of the Rule,* Interpretation Memo 89–10 (Aug. 23, 1989).

Two years later, on October 21, 1991, the Commission instituted public proceedings against Upton and Dolcemaschio. *In re Upton,* Exchange Act Release No. 29,842 (Oct. 21, 1991). The Commission's order alleged that FiCS's paydown practice resulted in a reserve bank account deficiency averaging $20 million per week between April 8, 1988 and May 30, 1989, placing over 114 broker-dealers who cleared through FiCS and over 200,000 customers at substantial risk. The order also alleged that Dolcemaschio had aided and abetted FiCS's violation of the Rule by implementing the paydown practice and that Upton had failed reasonably to supervise Dolcemaschio because he did not discover and stop the loan substitutions.

An evidentiary hearing was held before an Administrative Law Judge on March 26 through March 28, 1992. Upton raised several challenges to the Commission's enforcement action. First, he claimed that it was improper to order proceedings against him when FiCS had technically complied with the terms of the Rule at all times. Second, he offered economic justifications for the paydown practice.[3] Third, he claimed that the Commission had no statutory authority pursuant to section 15(b)(6) of the Exchange Act, 15 U.S.C. § 78o (b)(6), to sanction a supervisor for negligently permitting a subordinate to aid and abet a securities violation. Fourth, he objected to the SEC's determination that he was negligent in failing to discover the money management department's violation of the Rule.

Dolcemaschio consented to a finding that he had willfully aided and abetted FiCS's

---

3. At Upton's hearing, Dolcemaschio and other members of the money management department offered the following economic justification for FiCS's weekly routine: although unsecured loans carried a higher interest rate than customer-secured loans, FiCS had to determine how much customer-secured money it wished to borrow by 4:30 p.m. Friday, whereas FiCS did not have to determine how much unsecured debt it wished to incur until 6:00 p.m. Friday. FiCS would also receive a substantial influx of money between 4:30 p.m. and 6:00 p.m. on Fridays (up to $20 million). Dolcemaschio testified that it would be cheaper to wait until 6:00 p.m. Friday to borrow

whatever FiCS needed at higher interest rates rather than to borrow an unnecessarily larger sum of money at 4:30 p.m. Friday, albeit at lower interest rates. Conversely, during the week, it would be cheaper to use lower-interest customer-secured loans than higher-interest unsecured loans. Although Upton's economic rationale is plausible, no one ever studied the cost effectiveness of the pay-down practice at FiCS. Furthermore, Rex admitted that, when first questioned about the paydown practice in January 1989, she told the Commission's compliance examiner that FiCS paid down customer-secured loans every Friday "for 15(c)(3)."

violation of Rule 15c3–3(e) and to the imposition of sanctions. On April 27, 1992, the Commission suspended him from association with any broker, dealer, investment company, investment adviser or municipal securities dealer for a period of nine months and ordered him to cease and desist from any present or future violation of section 15(c)(3) of the Exchange Act, 15 U.S.C. § 78o (c)(3), and Rule 15c3–3(e), 17 C.F.R. § 240.15c3–3(e). *In re Dolcemaschio,* Exchange Act Release No. 34–30,634 (Apr. 27, 1992), 51 S.E.C. Docket 543.

On May 18, 1993, after post-trial briefing, the judge issued an initial decision and order censuring Upton. *In re Upton,* Initial Decision Release No. 34 (May 18, 1993), 54 S.E.C. Docket 317. The judge held that FiCS's paydown practice was "simply a device designed to evade the requirements of [Rule 15c3–3(e) ]." *Id.* at 321. Because FiCS was able to use customer funds to finance proprietary activities, the very practice the Rule was designed to prevent, FiCS did not require specific notice that this circumvention of the Rule amounted to a violation. Furthermore, the judge determined that the decision to make the weekly loan substitutions was not based on economic considerations unrelated to the reserve account computations. The judge likewise found that Upton negligently failed to discover and to stop the paydown practice, and that the Commission had the authority to sanction him under section 15(b)(4) and (6) of the Exchange Act, 15 U.S.C. § 78o (b)(4), (6).

The Commission's Division of Enforcement requested that Upton be suspended from association with a broker-dealer in a supervisory capacity. In light of Upton's unblemished record and the "uncertainty concerning the circumstances under which the paydown practice violated Rule 15c3–3(e)," however, the judge imposed the more lenient sanction of censure. *Upton,* 54 S.E.C. Docket at 327.

After an independent review of the record on January 30, 1995, the Commission affirmed the judge's finding of liability and his choice of sanctions. *In re Upton,* Exchange Act Release No. 34–35,292 (Jan. 30, 1995), 58 S.E.C. Docket 1864 (final decision). An order censuring Upton was issued that same day. *In re Upton,* Exchange Act Release No. 34–35,292 (Jan. 30, 1995), 58 S.E.C. Docket 1871.

## II.

On review, the Commission's findings of fact are deemed conclusive if supported by substantial evidence, 15 U.S.C. § 78y(a)(4), and its conclusions of law are upheld unless arbitrary, capricious, or an abuse of discretion, *Markowski v. S.E.C.,* 34 F.3d 99, 104 (2d Cir.1994) (citing *Higgins v. S.E.C.,* 866 F.2d 47, 49 (2d Cir.1989)).

### A. *Rule 15c3–3(e)*

Subparagraph (e) of Rule 15c3–3 was promulgated pursuant to section 15(c)(3) of the Securities Exchange Act of 1934, which authorized the Commission to prescribe rules and regulations "requir[ing] the maintenance of reserves with respect to customers' deposits or credit balances." 15 U.S.C. § 78o (c)(3). The purpose of the Rule is clear:

> to insure that customers' funds held by a broker-dealer ... and the cash which is realized through the lending, hypothecation and other permissible uses of customers' securities are deployed in safe areas of the broker-dealer's business related to servicing his customers, or to the extent that the funds are not deployed in these limited areas, that they be deposited in a reserve bank account.

*Adoption of Rule 15c3–3 under the Securities Exchange Act of 1934,* Exchange Act Release No. 9856 (Nov. 10, 1972). Earlier drafts of the Rule required broker-dealers to perform the reserve computation on a daily basis. *See Notice of Revision of Proposed Rule 15c3–3 Under the Securities Exchange Act of 1934,* Exchange Act Release No. 9775 (Sept. 14, 1972). The Commission revised the Rule to allow weekly, and in some cases monthly, computation of the reserve requirement based on a variety of considerations raised by the securities industry during the comment period: the prohibitive cost of performing daily computations for smaller broker-dealers; the difficulty of tracing and separating customer and non-customer transactions on a daily basis given established accounting,

clearance and settlement procedures; and the increased burden on firms employing outside computer service facilities for recording transactions.

As early as 1986, the Commission began investigating the use of the paydown practice in several brokerage firms.[4] The Commission referred several such "violations" of Rule 15c3–3(e) to the New York Stock Exchange and instructed individual broker-dealers to discontinue the practice. The Exchange, however, informed the Commission that it would not cite any of these firms for rule violations because "there ha[d] been no written interpretation with respect to this practice." Furthermore, in a letter to the Commission dated February 29, 1988, one firm subjected to the Commission's auditing process "respectfully suggest[ed] that this interpretation [of Rule 15c3–3(e)] should be communicated formally to the broker-dealer community rather than on a firm-by-firm basis through the audit process."

On December 16, 1987, the Commission ordered public administrative proceedings against the brokerage firm Underwood, Neuhaus & Co. and two of its operations managers for paying down loans secured by customer securities on its Rule 15c3–3(e) computation day and reinstating them shortly thereafter on six occasions. *In re Underwood, Neuhaus & Co.*, Exchange Act Release No. 25,200 (Dec. 16, 1987). The order also charged that Underwood, Neuhaus had pledged customer securities to obtain loans on six occasions. The Commission accepted an offer of settlement in that case and issued a consent order. *Underwood, Neuhaus*, 40 S.E.C. Docket at 785.

In light of the number of brokerage firms engaged in the paydown practice, in late 1987 the Commission and the Exchange established a Joint Industry Rule 15c3–3(e) Committee, composed of members of the Commission's staff, members of the New York Stock Exchange, and industry representatives, to discuss the impact of the *Underwood, Neuhaus* decision on securities firms

as well as to clarify the Commission's interpretation of Rule 15c3–3. On August 23, 1989, after Upton had stopped the paydown practice at FiCS, the Exchange issued to its members and member organizations Interpretation Memo 89–10, entitled "Broker–Dealer Censured for Violation of SEC Rule 15c3–3 and Discussion of the Intent and Objective of the Rule." Noting the sanctions imposed on Underwood, Neuhaus, the Memo stated the Commission's position that "substitution of proprietary or non-customer bank loans for customer bank loans only for the week-end or on the day of the Reserve Formula Computation may be regarded as an intentional circumvention of the rule if the customer loans are reinstated shortly thereafter."

## B. Reasonable Notice

 The Commission is entitled to interpret Rule 15c3–3(e) expansively in order to proscribe conduct that would otherwise constitute an evasion of the reserve requirement. Rule 15c3–3(e) technically requires only that broker-dealers perform a precise computation on a specific day of the week; nonetheless, as a result of FiCS's loan manipulations, FiCS's customer loans may have been exposed to substantial risk most of the week. Adopting Upton's narrow construction of the Rule "would be to exalt artifice above reality and to deprive the [rule] in question of all serious purpose." *Gregory v. Helvering*, 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935). The Commission may therefore broadly construe its rules to prevent such conduct. Likewise, because the Commission cannot foresee every possible evasion of the Rule, it may determine specific applications of the Rule on a case-by-case basis. *Cf. Shalala v. Guernsey Mem. Hosp.*, —— U.S. ——, ——, 115 S.Ct. 1232, 1237, 131 L.Ed.2d 106 (1995) ("The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication.").

---

**4.** These firms are: Morgan Stanley & Co.; Securities Settlement, Inc.; Thompson, McKinnon Securities, Inc.; The Illinois Company; Brokerage Clearing Services, Inc.; Shatkin–Lee Securities Co.; Mesirow & Co.; Underwood, Neuhaus & Co.; Roney & Co.; Interstate Securities Corp.; and FiCS.

Upton, however, claims that he should not be held liable for evading the literal proscriptions of Rule 15c3–3(e) because the Commission knew about the paydown practice well before the underlying events in this action took place and yet did not publicly condemn it until Interpretation Memo 89–10 was released on August 23, 1989. In rejecting Upton's argument, the Commission held that "[t]he language of the Rule, coupled with the releases preceding its adoption," clearly evinced the Commission's intent to forbid any evasion of the Rule and that "[a]ny remaining uncertainty should have been erased by [the 1988 consent order] in *Underwood, Neuhaus.*" *Upton,* 58 S.E.C. Docket at 1867.

█ Due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). Although the Commission's construction of its own regulations is entitled to "substantial deference," *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986), we cannot defer to the Commission's interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation. *See United States v. Matthews,* 787 F.2d 38, 49 (2d Cir.1986). This principle applies, albeit less forcefully, even if the rule in question carries only civil rather than criminal penalties. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982).

█ Because there was substantial uncertainty in the Commission's interpretation of Rule 15c3–3(e), Upton was not on reasonable notice that FiCS's conduct might violate the Rule. The Commission was aware that brokerage firms were evading the substance of Rule 15c3–3(e) by temporarily substituting customer loans on the Rule's computation date as early as 1986, two years before the events in this case took place. Apart from issuing one consent order carrying "little, if any, precedential weight," *In re Shipley,* 45 S.E.C. 589, 591 n. 6 (1974), the Commission took no steps to advise the public that it believed the practice was questionable until

August 23, 1989, after Upton had already stopped the practice. The Commission may not sanction Upton pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public. *Cf. Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1294 n. 13 (2d Cir.1973) ("[F]or the future the Commission should proceed by a rule or a statement of policy that would receive wider public attention. . . .").

The Commission also alleges that Upton should have been aware that FiCS's loan substitutions violated Rule 15c3–3(e) because Rex had been informally warned by an NYSE examiner. Eng, a personal friend of Rex, had advised her that FiCS "did not technically have a violation but that there was a problem with the spirit of the rule" and that the practice "was being looked at closely by the regulatory bodies." Eng suggested that "it would be better for [FiCS] to stop [the] practice." Although his advice turned out to have been correct, Eng's informal consultation with Rex was not actual notice of a change in the Commission's enforcement policy. At best, Eng's comments reveal the Commission's concern with the practice. They do not indicate that the Commission considered the practice a violation of the Rule.

The petition is granted, and the Commission's order is vacated.