SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Martin J. DRUFFNER,
et al., Defendants.

No. CIV.A.03–12154–NMG.

United States District Court,
D. Massachusetts.

Jan. 5, 2005.

Franklin C. Huntington, IV, Securities and Exchange Commission, Boston, MA, for Plaintiff.

R. Bradford Bailey, Denner O'Malley LLP, Laurie C. Carafone, Dwyer & Collora, LLP, J.W. Codinha, Nixon Peabody, LLP, Michael A. Collora, Dwyer & Collora, LLP, Steven N. Fuller, Nixon Peabody, LLP, Kay B. Lee, Test, Hurwitz, & Thibeault, LLP, David M. Osborne, Dwyer & Collora, LLP, Daniel M. Rabinovitz, Dwyer & Collora, LLP, David M. Ryan, Nixon Peabody, LLP, John A. Sten, Greenberg Traurig, LLP, Robert L. Ullmann, Nutter, McClennen & Fish, LLP, Sarah E. Walters, Nutter, McClennen & Fish, LLP, Boston, MA, for Defendants.

Jack W. Pirozzolo, United States Attorney's Office, Boston, for United States of America, Intervenor.

## MEMORANDUM & ORDER

GORTON, District Judge.

This civil case involves allegations by the Securities and Exchange Commission ("SEC") that defendants, former stock brokers and their branch manager, violated the Securities Act of 1933 ("the Securities Act") and the Securities Exchange Act of 1934 ("the Exchange Act") in connection with market timing activities. The SEC brings this action pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1).

## I. Background

### A. Factual Background

The following facts are set forth as alleged in the Amended Complaint, a 67–page tome with 434 pages of exhibits.

Defendants Druffner, Ficken, Ajro, Peffer and Bilotti ("the defendant brokers") were securities brokers in a Boston office of Prudential Securities, Inc. ("PSI"). From January, 2001, until their resignations in September, 2003, they engaged in thousands of "market timing" trades in an aggregate amount of more than One Billion dollars and which generated more than Five Million dollars of net commissions for the defendants. The SEC alleges that, in the process, the defendant brokers defrauded more than 50 mutual fund companies.

Druffner led a group of brokers which handled market timing transactions for five principal clients ("the Druffner Group"). Ficken and Ajro were members of the Druffner Group. Peffer led a group of brokers which handled market timing transactions for two principal clients ("the Peffer Group"). Bilotti was a member of the Peffer Group. Defendant Shannon joined PSI in 1996 and was the Manager of the Boston branch of PSI from December, 2001 until September, 2003, when he resigned.

Market timing is a form of arbitrage in which investors buy, sell and exchange mutual fund shares on a very short-term basis in order to exploit inefficiencies in mutual fund pricing. Although market timing can

lead to profits for individual investors, such profits come at the expense of long-term investors in the fund. As a consequence, many mutual funds attempt to prohibit market timing by, for example, imposing restrictions on excessive trading by individual accounts.

The SEC alleges that defendants violated the securities laws by making false statements and material omissions in connection with their market timing activities. The defendant brokers allegedly used numerous broker identification numbers (called "FA numbers," shorthand for "financial advisor numbers") and opened nearly 200 customer accounts under fictitious names. The use of fictitious names concealed the brokers' identities and the identities of their clients, thereby making it difficult for the funds to detect and stop their market timing activities and causing the fund companies to process transactions that they otherwise would have rejected.

When mutual fund companies detected defendant brokers' market timing activities and imposed blocks on further market timing (through a so-called "block letter"), the defendant brokers allegedly would use FA numbers and customer accounts that had not yet been blocked to evade the restrictions imposed by the mutual funds and to place more market timing transactions. The defendant brokers allegedly continued the offending activities even after PSI announced a policy prohibiting the use of manipulative techniques designed to avoid detection of certain trading activities, such as executing transactions through alternate FA numbers.

The SEC alleges, in the alternative, that the defendant brokers are liable for aiding and abetting their clients' uncharged violations of the securities laws.

The SEC further alleges that Shannon assisted the defendant brokers' scheme by approving new customer accounts and FA numbers, approving the transfer of cash between accounts and failing to enforce PSI's policies against market timing.

The three-count, amended complaint alleges that 1) the defendant brokers violated Section 17(a) of the Securities Act (Count I), 2) the defendant brokers violated Section 10(b) of the Exchange Act and Rule 10b–5 thereunder or aided and abetted the uncharged violations of those provisions by their clients (Count II) and 3) defendant Shannon aided and abetted the broker defendants' violations of Section 10(b) and Rule 10b–5 by providing knowing and substantial assistance to their market timing activities (Count III).[1]

---

1. Section 17(a) of the Securities Act provides that it is unlawful for any person in the offer or sale of securities:
 (1) to employ any device, scheme, or artifice to defraud, or
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
 15 U.S.C. § 77q.
 Section 10(b) of the Exchange Act provides that it is unlawful:

To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. § 78j.
 Rule 10b–5 provides that it is unlawful:
 (a) to employ any device, scheme, or artifice to defraud,
 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

The complaint seeks 1) a permanent injunction to restrain the defendants and their agents from violating the statutes and rule involved in this case, 2) disgorgement and pre-judgment interest and 3) civil monetary penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and/or Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## B. Procedural History

The SEC filed a complaint against defendants on November 4, 2003. At a motion hearing on June 14, 2004, Judge Lindsay found that the SEC had failed to comply with the requirements of Fed. R.Civ.P. 9(b), which requires that fraud be pled with particularity, and granted defendants' motions to dismiss the complaint with leave to the SEC to re-file within 30 days.

The case was transferred to this Session on June 24, 2004. The SEC filed an amended complaint on July 14, 2004. Pending before the Court are the defendants' renewed motions to dismiss the amended complaint.

## II. *Discussion*

Defendants have filed four separate motions to dismiss in this case: Docket Nos. 57 (Peffer), 59 (Bilotti), 63 (Shannon) and 66 (Druffner, Ajro and Ficken). Each motion is supported by a separate memorandum. The SEC filed a single memorandum in opposition which addressed the arguments raised by all defendants. Because defendants' motions and memoranda contain similar arguments, the Court will address them conjointly.

Each defendant argues that the amended complaint should be dismissed because

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in

it fails to state claims with the particularity required by Fed.R.Civ.P. 9(b). The defendants also raise other defenses, including the contention that the action violates due process and that the SEC has failed to allege a primary violation as required for aider and abettor liability.

## A. Standard for Motions to Dismiss

A court may not dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "unless it appears, beyond doubt, that the [p]laintiff can prove no set of facts in support of his claim which would entitle him to relief." *Judge v. City of Lowell,* 160 F.3d 67, 72 (1st Cir.1998)(quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. *Nollet v. Justices of the Trial Court of Mass.,* 83 F.Supp.2d 204, 208 (D.Mass.2000) *aff'd,* 248 F.3d 1127, 2000 WL 1803320 (1st Cir.2000).

Furthermore, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.,* 199 F.3d 68, 69 (1st Cir. 2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. *See Nollet,* 83 F.Supp.2d at 208.

## B. Legal Analysis

1. *Particularity Required by Rule 9(b)*

 Rule 9(b) of the Federal Rules of Civil Procedure provides that:

connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Because the SEC's allegations rest on fraud, the complaint must satisfy the requirements of Rule 9(b). The SEC does not dispute that the pleading requirements of Rule 9(b) apply to it.

 Courts in the First Circuit interpret Rule 9(b) to require that the complaint allege the "time, place, and content of the alleged misrepresentations with specificity." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir.1999). Further, the complaint must explain why the challenged statement or omission is misleading by "provid[ing] some factual support for the allegations of fraud." *Id.,quoting Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991). Thus, the complaint must specify

> (1) the allegedly fraudulent statements; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent.

*In re Allaire Corp. Secs. Litig.*, 224 F.Supp.2d 319, 325 (D.Mass.2002); *see also Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir.1997).

The amended complaint meets all of the requirements of Rule 9(b). It details the allegedly fraudulent scheme, including the broker's role in placing the trades and how the brokers used multiple FA numbers and customer account numbers to disguise their clients' purchases and sales of mutual fund shares and to place trades even after certain clients had been blocked from future trading due to their market timing activities. It identifies the seven principal clients for whom the brokers processed market timing trades, the various FA numbers each of the brokers used, the various customer account numbers used for each client and the date, dollar amount, fund and identifiers for each transaction involved in the allegedly fraudulent scheme. The particularity with which the amended complaint is pled meets the requirements of the Federal Rules of Civil Procedure and the caselaw of this circuit. *See, e.g.,* Fed.R.Civ.P. 9(b); *In re Allaire Corp. Secs. Litig.*, 224 F.Supp.2d at 325.

 The broker defendants argue that the complaint fails to allege that they made actionable misrepresentations or omissions. They contend that they had no duty to disclose to the fund companies that they were using multiple account numbers and FA numbers. As Judge Linsday noted in a hearing on the motion to dismiss the original complaint, however, the securities laws give rise to a duty to disclose any information necessary to make an individual's voluntary statements not misleading. See Rule 10b–5(b), 17 C.F.R. § 240.10b–5(b)(providing that it is illegal to "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading"). The complaint sufficiently alleges that, at the very least, defendants failed to state material facts necessary in order to render the statements they made not misleading under the circumstances.

Defendants have gone to great lengths to inform this Court that market timing is not illegal. The SEC does not dispute that specific contention but alleges that the defendants' other acts and omissions with respect to the market timing scheme amount to fraudulent misrepresentations. Specifically, the SEC alleges that the defendant brokers' use of multiple FA numbers and account numbers constitute material misrepresentations and/or omissions

which are prohibited by the securities laws.

■ The defendant brokers contend that the complaint fails sufficiently to differentiate between defendants or to identify the role each broker played in the allegedly fraudulent scheme. That argument is unavailing.

Recently, a federal district court found that

[W]hen information giving rise to securities fraud is exclusively held by defendants, the particularity requirement of Rule 9(b) is relaxed.... [The] plaintiff is required to distinguish among defendants to the extent that they may reasonably be expected to do so, but the complaint need not attribute specific acts to specific defendants if the complaint sufficiently describes the fraudulent acts and provides the individuals with sufficient information to answer the allegations.

*SEC v. Santos*, 292 F.Supp.2d 1046, 1051 (N.D.Ill.2003) (citations and quotation marks omitted). The point is well taken.

The complaint alleges that Druffen, Ficken and Ajro worked together to effectuate their fraudulent scheme and that Peffer and Bilotti worked together to effectuate a similar fraudulent scheme. Each allegedly fraudulent transaction is identified along with the FA number that was used in processing it. Although some FA numbers were assigned to groups of two or three brokers, the SEC's failure to identify which broker actually processed each transaction does not render the amended complaint defective because, to the extent it lacks details as to which defendant undertook certain acts, such information is in the exclusive control of the defendants. This is not a case in which the plaintiff has made vague and undifferentiated allegations against a large group of defendants without explaining what role each individual played in the scheme.

■ Shannon contends that the complaint against him must be dismissed because it fails to allege that the defendant brokers violated any provisions set forth in the prospectus of any individual fund. He offers no legal support for that assertion, however, and the securities laws do not require that a violation of Section 10(b) or Rule 10b–5 must involve a violation of the provisions of the prospectus of a particular fund. The plain language of those provisions proscribes fraudulent devices or statements without limiting their reach to the kinds of statements that are prohibited in a prospectus.

Mr. Shannon also sets forth a list of details which he claims are required with respect to each transaction. He contends that the SEC must specify, with respect to each prohibited transaction, several details including that 1) a defendant broker received a block letter blocking his FA number, 2) Shannon also received the letter, 3) Shannon approved a new FA and/or client number and 4) the new number was used, with Shannon's knowledge, to trade using market timing strategies. He fails to cite caselaw in support of his proposition and the caselaw and statutes that require fraud to be pled with particularity simply do not require the level of detail Shannon suggests. The amended complaint recites sufficient information about the allegedly fraudulent acts or omissions to state a claim against the defendant brokers and Shannon.

### 2. Scienter

■ Proof of scienter, "a mental state embracing intent to deceive, manipulate or defraud," is required in securities fraud cases. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To survive a motion

to dismiss a securities fraud case in the First Circuit, the plaintiff must allege facts which give rise to an inference of scienter that is "both reasonable and strong." *Greebel,* 194 F.3d at 195–96 (internal quotation marks omitted); *see also Maldonado v. Dominguez,* 137 F.3d 1, 9 (1st Cir. 1998) ("This circuit has been clear and consistent in holding that, under section 10(b), plaintiffs must plead specific facts giving rise to a 'strong inference' of fraudulent intent.") (citation omitted). While some circuits look for motive and opportunity when evaluating allegations of scienter, the First Circuit uses a fact-specific inquiry. *Greebel,* 194 F.3d at 196.

Each defendant contends that the complaint fails adequately to allege scienter. To the contrary, the information set forth in the complaint, including the long lists of multiple account numbers for identified clients and multiple FA numbers and e-mails set forth in Paragraph 39, offers reasonable and strong support for an inference that each broker intentionally mislead certain funds with respect to the identities of the investors. Although Peffer correctly notes that none of the e-mails set forth in Paragraph 39 was sent to or from him, the complaint sufficiently alleges scienter with respect to him by listing trades that were processed using the three different FA numbers assigned to him and stating that those trades were made in furtherance of the allegedly fraudulent scheme.

■ Druffner and Ajro note that the allegations in the complaint do not prove that the purpose of using multiple account numbers and FA numbers was to make the brokers' market timing activities difficult to detect and that there are other plausible purposes for such behavior. Their observation is accurate but, at this stage, the SEC need not prove its allegations to the exclusion of all other possibili-

ties. It has set forth specific facts that give rise to a reasonable, strong inference of fraudulent behavior and that is adequate to survive a motion to dismiss.

■ The complaint alleges that Shannon knew about the brokers' scheme and provided knowing and substantial assistance by, among other things, authorizing the brokers to open more customer accounts to obtain additional FA numbers. Those allegations are sufficient to create a reasonable and strong inference of scienter with respect to Shannon.

3. *Aiding and Abetting Liability*

■ To establish aiding and abetting liability in a Section 10(b) action, a plaintiff must establish

(1) the commission of a violation of § 10(b) or rule 10b–5 by the primary party;

(2) the defendant's general awareness that his role was part of an overall activity that is improper; and

(3) knowing and substantial assistance of the primary violation by the defendant.

*Cleary v. Perfectune,* 700 F.2d 774, 777 (1st Cir.1983), overruled on other grounds by *Cent. Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *see also SEC v. Peretz,* 317 F.Supp.2d 58, 63 (D.Mass.2004).

■ Count II alleges that the defendant brokers violated Section 10(b) of the Exchange Act and Rule 10b–5 thereunder or, in the alternative, that they aided and abetted the uncharged violations of those provisions by their clients. The defendant brokers contend that the complaint insufficiently charges aiding and abetting because it fails to allege a primary Section 10(b) or Rule 10b–5 violation underlying the aiding and abetting charges. They are

correct in that the complaint does not allege that any clients violated the securities laws.

■ Although the complaint contains information from which one may infer that the clients were aware of the use of multiple client or FA numbers, the complaint does not allege facts that give rise to a "reasonable and strong" inference of scienter with respect to the defendants' clients. The portion of Count II that alleges that the defendant brokers aided and abetted their clients' uncharged violations of Section 10(b) or Rule 10b–5 will, therefore, be dismissed. Because the SEC has already had the opportunity to re-plead its complaint, that portion of Count II will be dismissed with prejudice.

■ Count III alleges that Shannon aided and abetted the broker defendants' violations of Section 10(b) and Rule 10b–5. Shannon's contention that the complaint fails to allege any affirmative conduct by him that could amount to knowing and substantial assistance is self-serving and erroneous. The complaint alleges that Shannon knew about the fraudulent scheme and furthered it by 1) approving additional account numbers and FA numbers, 2) authorizing the processing of unfinished transactions at the New York office and 3) failing to stop the brokers' fraudulent activity after he received numerous block letters complaining of such activity when he had a duty as Branch Manager to do so. Such allegations involve specific instances of affirmative conduct that supports the charge the Shannon aided and abetted the brokers' securities law violations.

## 4. Due Process

■ Peffer and Bilotti contend that, because market timing is not illegal *per se*, it would violate due process to hold them liable in this case in that they could not have known that the alleged misconduct was wrong. "Due process requires that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir.1996) (quotation marks omitted).

The case on which both Peffer and Bilotti rely, *Upton v. SEC*, is clearly distinguishable. In *Upton*, the Second Circuit Court of Appeals held that it violated due process to hold an executive liable for failing reasonably to supervise a subordinate with a view toward preventing the firm's violation of Rule 15c3–3(e) (relative to the requirement that broker-dealers maintain a certain balance in a special reserve bank account for the benefit of customers) in a case in which 1) the rule was complex, 2) it was undisputed that the firm complied with the literal terms of the Rule at all times and 3) the SEC's interpretation of the rule represented a substantial change in SEC enforcement policy that had not reasonably been communicated to the public. *Id.*

In the case at bar, by contrast, the defendants are charged with fraud and the violation of Rule 10b–5, no doubt the most frequently cited rule in securities law. The defendants were professional (presumably licensed) brokers and cannot claim that they had no notice of the illegality of defrauding mutual funds by making material misstatements or omissions. As the Second Circuit Court of Appeals stated three years after *Upton* when rejecting another due process claim, defendants cannot "credibly claim lack of fair notice of the proscription against defrauding investors." *Valicenti Advisory Services, Inc. v. SEC*, 198 F.3d 62, 66 (2d Cir.1999).

## 5. Statutory Sellers

■ Druffner, Ajro and Ficken contend Count I, which alleges violations of

Section 17(a) of the Securities Act, must be dismissed because the defendant brokers were not statutory sellers. Section 17(a) applies to "any person in the offer or sale of any securities." 15 U.S.C. § 77q. Section 2(a)(3) of the Securities Act provides the following definitions for terms used in that Act:

> The term "sale" or "sell" shall include every contract of sale or disposition of a security...for value. The term "offer to sell", "offer for sale", or "offer" shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.

15 U.S.C. § 77b.

The SEC's response to defendants' argument is deficient. While the SEC states that defendants' alleged liability as sellers is based upon their role in their clients' exchanges (not purchases) of shares, it fails to address the argument that, as brokers merely executing their clients' buy and sell orders, the defendant brokers cannot be liable under Section 17(a) as statutory sellers.

Nonetheless, it is inappropriate to dismiss the Section 17(a) claim. Defendants have cited no caselaw in the First Circuit or elsewhere to support their argument that liability cannot be imposed on brokers pursuant to Section 17(a). This Court is conscious that

> [t]he statutory terms ['offer' and 'sale'], which Congress expressly intended to define broadly, are expansive enough to

encompass the entire selling process, including the seller/agent transaction.

*United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979). It therefore declines to hold that defendants are insulated from Section 17(a) liability based upon their status as brokers.

The defendants cite cases interpreting Section 12 of the Securities Act, 15 U.S.C. § 77*l*, to support the proposition that Section 17(a) does not apply to brokers such as themselves. Section 12 applies to "any person who offers or sells a security." 15 U.S.C. § 77*l*. The applicable statutory definitions of "offer" and "sell" are the same as those that apply to Section 17 which, as noted above, applies to "any person in the offer or sale of any securities." 15 U.S.C. § 77q. Even if the meaning of those terms in Sections 12 and 17 were identical, however, defendants' argument would fail because the cases involving Section 12 do not compel the conclusion that the defendant brokers in this case cannot be found liable as statutory sellers.[2]

In *Pinter v. Dahl,* the United States Supreme Court noted that

> It long has been "quite clear," that when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller.

486 U.S. 622, 646, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (citing 3 L. Loss, Securities Regulation 1016 (2d ed.1961)). The

---

**2.** This Court does not, by examining cases dealing with Section 12, intend to imply that the meaning of the terms "offer" and "sell" as used in Section 17 is identical to those terms as they are used in Section 12. Indeed, it is unclear that the terms have the same meaning even within the subsections of Section 12. In a case involving the meaning of

those terms as used in Section 12(1), the Supreme Court explicitly stated that "this case does not present, nor do we take a position on, the scope of a statutory seller for purposes of § 12(2)." *Pinter v. Dahl,* 486 U.S. 622, 642 n. 20, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

Court cautioned that "[b]eing merely a "substantial factor" in causing the sale of unregistered securities is not sufficient in itself to render a defendant liable under § 12(1)." *Id.* at 654, 108 S.Ct. 2063. However, the Court went on to conclude that liability does extend to

> the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner, ... [such as when the person] anticipates a share of the profits or receives a brokerage commission.

*Id.* at 647, 654, 108 S.Ct. 2063 (quotation marks, alterations and citations omitted). The Court cited with approval a case in which the First Circuit Court of Appeals held that

> Sec. 12(2) imposes a liability for misrepresentations not only upon principals, but also upon brokers when selling securities owned by other persons. This is not a strained interpretation of the statute, for a selling agent in common parlance would describe himself as a "person who sells," though title passes from his principal, not from him.

*Cady v. Murphy,* 113 F.2d 988, 990 (1st Cir.1940); *see also Pinter,* 486 U.S. at 644–45, 646, 654, 108 S.Ct. 2063.

Although other circuit and district courts have held brokers not to be liable as statutory sellers pursuant to Section 12, the cases in which courts have so held are not binding on this Court and are distinguishable from the instant case. *See Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521, 1522 (11th Cir.1991) (declining to impose Section 12(2) liability upon bank based on its "mechanical act" of executing plaintiff's orders); *Leonard v. Shearson Lehman/Am. Express Inc.,* 687 F.Supp. 177, 180 (E.D.Pa.1988) (declining to impose Section 12(2) liability upon defendant broker where there was no privity or special relationship between buyer and seller, based upon the "strict privity requirements" of the Third Circuit).

In this case, the complaint alleges that the defendant brokers did more than mechanically execute their clients' sell orders; it alleges that they used discretion in executing the trades through techniques such as using multiple broker numbers and customer numbers. Such alleged actions are sufficient to bring them within the definition of "sellers" pursuant to Section 17. Accordingly, Count I will not be dismissed.

## ORDER

Based upon the foregoing, Defendants' Motions to Dismiss (Docket Nos. 57, 59, 63 and 66) are, to the extent that they seek to dismiss the portion of Count II alleging that the defendant brokers aided and abetted uncharged violations of the securities laws by their clients, **ALLOWED**, and are, in all other respects, **DENIED**.

**So ordered.**